UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALEXANDRA HADDAD,
    Plaintiff,

v.                                                    C.A. No. 18-314-JJM-PAS

BRYANT UNIVERSITY, a non-profit
Corporation,
    Defendant.

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Alexandra Haddad entered the Physician's Assistant Program ("PA Program") at Bryant University in January 2016. Unable to meet the academic requirements throughout, Bryant placed her on Academic Probation during her first term and dismissed her from the PA Program twice. Successful appeals of these dismissals and the flexibility Bryant showed her in applying its policies allowed her to continue her studies albeit through a plan of remedial assessments and rotations. But after continuing to struggle despite the adjustments made to her academic progression, Ms. Haddad was dismissed from the program for the third and final time in December 2018.

Ms. Haddad challenges her final dismissal through this action's breach of contract and misrepresentation claims. She alleges that a February 1, 2017 letter from Program Director Jay Amrien setting forth a remediation progress plan created a new implied-in-fact contract that Bryant breached by dismissing her from the PA

Program even though she complied with the terms of the letter. Because the Court finds that the February 1, 2017 letter was not a contract governing the relationship between Ms. Haddad and Bryant, there is no legal or factual basis for her contract or misrepresentation claims against Bryant. The Court therefore grants judgment to Bryant.

## FACTS

Bryant's policies, procedures, and academic requirements are contained in the Student Manual and Academic Policies and Procedures ("Academic Policies") documents. ECF No. 18-1 at 3. The PA Program has two phases: a didactic phase, which largely consists of one year of classroom learning, and a clinical rotations phase, where students spend fifteen months working in various medical fields. *Id.* at ¶ 4. The didactic year is divided into four terms and each term builds on the previous term's work. *Id.* at ¶ 5. Students must get a minimum passing grade of a 75 and maintain an overall Grade Point Average ("GPA") of 3.0 for each term in the didactic year. *Id.* at ¶ 6.

If a student fails a course, Bryant will place her on Academic Probation, and she must take a remediation exam. *Id.* at ¶ 7. If the student passes the remediation exam, she will receive a 75% and will progress to the next term, but will remain on Academic Probation. *Id.* at ¶ 8. Failure to maintain a 3.0 GPA per term during the didactic phase will result in Academic Probation; the student must then "demonstrate continual improvement to remain in the program as defined as an improving GPA." *Id.* at ¶ 9. "Students who fail to improve their overall GPA from the previous term

will be referred to the [Academic Support and Remediation Committee] for recommended dismissal." *Id.* at ¶ 9. To progress from the didactic phase into the clinical rotations phase, a student must have at least a 3.0 GPA. During the clinical phase, students must achieve an 83% or above to pass each rotation. *Id.* at ¶ 10. Students were required to achieve an overall 3.0 GPA in order to graduate. *Id.* at ¶ 2.

Ms. Haddad reviewed Bryant's Academic Policies and understood that she would have to achieve a cumulative 3.0 GPA to be considered for graduation. *Id.* at ¶ 18. She had a meeting on her first day of classes where she discussed all aspects of the program, including academic and non-academic standards, graduation requirements, and program policies. *Id.* at ¶ 19.

Ms. Haddad failed two classes during the first didactic term but took and earned a 75% on the remediation assignment and exam. *Id.* at ¶¶ 21, 22. She still did not have the required 3.0 GPA, so Bryant put her on Academic Probation. *Id.* at ¶ 23. During her second term, she failed four tests and her GPA remained below a 3.0 though it did not improve from the previous term. *Id.* at ¶ 25. Her GPA dropped during her third term after she failed eight tests. *Id.* at ¶ 26. Because Ms. Haddad did not have the required 3.0 GPA, Bryant dismissed her from the PA Program. *Id.* at ¶ 27. She appealed her dismissal and was reinstated with the provision that she

3

raise her GPA to the required 3.0 by the end of the fourth term. *Id.* at ¶¶ 28-29. She did not and was dismissed for the second time. *Id.* at ¶ 31.

Ms. Haddad appealed, and Bryant allowed her to go through a remedial process that included taking a summative exam and a PACKRAT[1] test. *Id.* at ¶ 32. She failed both exams. *Id.* at ¶ 34. Program Director Amrien sent Ms. Haddad a letter, dismissing her for the third time from the PA Program effective January 1, 2017. *Id.* at ¶ 35. Ms. Haddad appealed again, writing to the Provost outlining the basis for her appeal and pledging to improve her academic performance and detailing how she intended to so improve. *Id.* at ¶ 36. The Provost decided to defer her dismissal and allow her to get back on track by doing a remedial clinical rotation; she met with Christopher Ferreira, Director of Clinical Education, to discuss a plan.[2] *Id.* at ¶ 38.

Mr. Amrien wrote to Ms. Haddad on February 1, 2017, laying out the parameters of the Remedial Rotation she discussed with Mr. Ferreira that would allow her to progress from the didactic program to the clinical program. Bryant expected her to complete a remedial clinical rotation with a passing preceptor evaluation score of her performance, to get a passing score on the Family Medicine

---

[1] PACKRAT is a national exam of the Physician Assistant Education Association.

[2] Mr. Ferreira memorialized the conversation in a Student Encounter note. ECF No. 18-1 at ¶¶ 38-39. Mr. Ferreira says that he told Ms. Haddad that she still had to achieve the overall 3.0 GPA to graduate from the PA Program. *Id.* at ¶ 40. She disputes that he told her that the 3.0 GPA requirement still applied to her, at that meeting or any time thereafter. *Id.* Moreover, she argues that this note is unreliable because it was written in Word and could have been altered at any time.

4

End-Of-Rotation Exam, to take an additional PACKRAT exam and receive a score equal to or greater than 379, and to complete at least 250 Rosh Review Questions. *Id.* at ¶ 41. Ms. Haddad was told that if she completed this remedial clinical rotation, she still needed to complete all twelve clinical rotations in the PA Program. The letter also noted that this appeal was final and if she failed to pass any clinical rotation, she would be dismissed. *Id.* at ¶ 41. She testified that she believed that the February 1st letter set forth her personal graduation requirement and she was not told that she still needed to achieve an overall 3.0 GPA to graduate. *Id.* at ¶ 44.

Mr. Ferreira met with Ms. Haddad again in March to discuss her progress through the Remedial Rotation. *Id.* at ¶ 42. Again, the parties dispute whether Mr. Ferreira told her that she still had to achieve an overall 3.0 GPA to graduate; he testified that he did and noted that in the Student Encounter Form and she denies this. *Id.* at ¶¶ 42-43. While she met the four requirements set forth in the February 1st letter, Ms. Haddad failed to attain the 3.0 GPA that she would need to graduate and was dismissed for a third and final time in December. *Id.* at ¶¶ 48-50. She appealed this decision based on her understanding that she did not need a 3.0 GPA

to graduate, but Bryant denied her, relying on the requirement as set forth in the Academic Policies. *Id.* at ¶¶ 51-52.

Ms. Haddad filed this suit against Bryant for breach of contract and fraudulent and negligent misrepresentation. Now Bryant moves for summary judgment (ECF No. 16), which Ms. Haddad opposes (ECF No. 18).

## STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. *Continental Cas. Co. v. Canadian Univ. Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991). Once this is done, Rule 56(c) requires that summary judgment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. A material fact is one affecting the lawsuit's outcome. *URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ.*, 915 F. Supp. 1267, 1279 (D.R.I. 1996).

## DISCUSSION

The Court begins with Bryant's arguments in favor of summary judgment on Ms. Haddad's two claims.

### A. Breach of Contract Claim

The Rhode Island Supreme Court[3] has been clear, "a student and private university relationship is essentially contractual in nature . . . [with] unique

---

[3] Ms. Haddad has invoked the diversity jurisdiction of this Court under 28 U.S.C. § 1332 (ECF No. 1 at 4), so familiar principles require that Rhode Island state law governs this case substantively. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

6

qualities." *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004). So, at the outset of the analysis of the breach of contract claim, the Court must determine what contract governs the parties' relationship here. The parties do not dispute and the Court therefore concludes that the Academic Policies govern the student-university relationship. The policies set forth in the Academic Policies are clear and unambiguous and there is no dispute that Ms. Haddad was dismissed because she did not meet the overall 3.0 GPA graduation requirement as set forth in the Academic Policies.

When looking at the contract terms, "the appropriate inquiry is whether the term at issue in a contract involving a private educational institution is contrary to law or public policy." *Id.* at 38. The Rhode Island Supreme Court has found that a contract violates public policy only if it is: "'[1] injurious to the interests of the public, [2] interferes with the public welfare or safety, [3] is unconscionable; or [4] tends to injustice or oppression.'" *Id.* at 39 (quoting *City of Warwick v. Boeng Corp.*, 472 A.2d 1214, 1218 (R.I. 1984)). Ms. Haddad does not claim that enforcing the 3.0 GPA graduation requirement as to her or any other PA Program student meets any of the four conditions noted in *Gorman*. ECF No. 18 at 17. And as Bryant points out, it is important for it to have the discretion to enforce its graduation requirements to ensure that its graduating Physician Assistants are competent and prepared to serve the medical community and patients. *See Gorman*, 853 A.2d at 34 (finding that a school has "broad discretion to meet its educational and doctrinal responsibilities" and recognizing "that implicit in an educational contract is the right to modify

7

disciplinary and academic rules and regulations."; *see e.g., Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976) ("[i]mplicit in the student's contract * * * is the student's agreement to comply with the university's rules and regulations, which the university clearly is entitled to modify so as to properly exercise its educational responsibility"). Therefore, because the Academic Policies formed the contract between Ms. Haddad and Bryant, the 3.0 overall GPA requirement for graduation was not contrary to law or public policy, and she failed to meet that requirement, the Court finds that Ms. Haddad has no claim for breach of contract relative to her dismissal from the PA Program.

Ms. Haddad does not focus her arguments on the Academic Policies, however, but argues that the February 1st letter formed a new, implied-in-fact contract and that contract contained her personal graduation requirement, which contrary to the Academic Policies, did not mention that she needed to achieve an overall 3.0 GPA to graduate. Bryant objects, arguing that the Academic Policies is the operative contract here and that the correspondence allowing Ms. Haddad to progress through a remediation process after her third dismissal was not a new contract, but a modification as is contemplated in its Academic Policies.

The record does not support a finding that the February 1st letter is an implied-in-fact contract. An implied-in-fact contract "is a form of express contract wherein the elements of the contract are found in and determined from the relations of, and communications between the parties, rather than from a single clearly expressed written document." *Marshall Contractors, Inc. v. Brown Univ.*, 692 A.2d

665, 669 (R.I. 1997). But where there is an express contract, there cannot also be an implied-in-fact one unless the implied contract addresses a different subject matter. *Bushkin Assoc., Inc. v. Raytheon Co.*, 815 F.2d 142, 151 (1st Cir. 1987).

As stated, there is no dispute that the Academic Policies is an express contract. The policies discuss the requirements to progress through the PA Program and to graduate. They detail a process for what happens if a student does not meet the PA Program's academic requirements, including remediation to improve grades, deceleration to slow down progression through the PA Program to catch up academically, and dismissal. The Academic Policies apply to all students, including Ms. Haddad. While it is tailored to Ms. Haddad's academic situation, the February 1st letter covers the same subject matter as the Academic Policies. It acknowledges that this program modification is remedial and in lieu of immediate dismissal. The letter details her remedial plans to improve her grades so that she can progress from the didactic phase to the clinical year. Because it covers the same subject matter as the Academic Policies, the February 1st letter cannot be an implied-in-fact contract.

Moreover, the Court finds that the remediation process set out in the four essential pieces of correspondence at the root of Ms. Haddad's case reflects the process that Bryant described in its Academic Policies. "[M]atters of academic judgment are generally better left to the educational institutions than to the judiciary and [courts] have accorded great deference where such matters are at issue." *Mangla v. Brown*

*Univ.*, 135 F.3d 80, 84 (1st Cir. 1998). The January 2017[4] letter from Mr. Amrien was the first in this line of correspondence, where he communicated to Ms. Haddad that she did not meet the minimum requirements for retention or for progression in the PA Program, dismissing her from the program for the third time. Ms. Haddad responded, identifying her shortcomings and impediments to success and pledging to ramp up her academic efforts to comply with the program's requirements and to avoid dismissal. Ms. Haddad references her failure to maintain a 3.0 overall GPA and recognizes that her GPA was a factor in Bryant's decision to dismiss her.

Program Director Amrien's February 1, 2017 letter memorialized a meeting Mr. Ferreira had with Ms. Haddad, deferring her dismissal and allowing her to progress to the clinical rotation without a 3.0 GPA provided that she satisfactorily complete a remedial rotation. The remedial program was in addition to the standard PA Program requirements contained in the Academic Policies; she had to take a remedial clinical rotation that did not count toward the twelve clinical rotations required, an additional PACKRAT exam with a passing score, to complete extra Rosh Review Questions, and receive a passing score on a Family Medicine exam. The letter carefully discussed her "progress" in the PA Program, not her graduation from the program. That letter was unambiguously limited to what she needed to do to progress

---

[4] This letter does not note the day it was written but precedes Ms. Haddad's January 19, 2017 letter appealing her dismissal.

10

into the clinical rotation[5] without a 3.0 GPA because she was having academic difficulty.

These communications did not form a new contract but detailed the progress that Ms. Haddad needed to make to get back on track. Ms. Haddad argues that she reasonably expected that if she met the expectations set forth in the February 1st letter, she would progress to the clinical stage and, presuming she met the expectations set forth in the Academic Policies for those rotations, she would graduate even if she did not meet the overall 3.0 GPA graduation requirement. She bases this claim on the fact that the February 1st letter does not specify that the Academic Policies' 3.0 GPA graduation requirement continued to apply to her and that she asserts that no one at Bryant told her that she still had to have a 3.0 GPA to graduate. But the February 1st letter and follow up emails evidence a mutual agreement to change the progression through the PA Program–flexibility that is contemplated in the Academic Policies–not a change to the GPA graduation requirement.

There is nothing in that series of correspondence that undermines the Academic Policies governing the remediation, dismissal, or graduation process. No reasonable jury could conclude that Ms. Haddad should have believed that she would be permitted to graduate without meeting the 3.0 GPA requirement. Bryant allowed her to progress in the PA Program from the didactic term to the clinical term without

---

[5] Mr. Ferreira sent Ms. Haddad an email, acknowledging that she met the requirements of the "remediation rotation," i.e. she accomplished the four steps Bryant identified in the February 1st letter that she needed to complete before she could progress to her first clinical rotation.

11

maintaining the 3.0 GPA once she successfully completed the remedial clinical rotation. Ms. Haddad concedes that Bryant never told her that she did not need to meet the same overall graduation requirements described in the Academic Policies that applied to all students.

Finally, the Court finds no support in the record for Ms. Haddad's assertion that Bryant PA Program staff never communicated to her after January 2017 that she still had to have an overall 3.0 GPA to graduate, and this omission led her to believe that that policy no longer applied to her. The only contract at issue in this case—the Academic Policies—is between Bryant and Ms. Haddad. Although as PA Program Director, Mr. Amrien may have had the flexibility and discretion to craft a remediation or deceleration plan specific to Ms. Haddad's personal academic situation, she could not reasonably expect that he had the power to exempt her from the Academic Policies' overall graduation requirements. *See Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 63 (1st Cir. 2016) (citing *Mangla*, 135 F.3d at 83 (promises made to students by faculty or administrators are not binding on the university when such promises are contrary to academic policies set forth in student catalogs and manuals)).

In the alternative, Ms. Haddad argues that Bryant waived the 3.0 GPA graduation requirement through its statements and actions. Even presuming that Bryant never reiterated that the 3.0 GPA policy continued to apply to her, the Court is not convinced from this record that Bryant waived a single policy in the Academic Policies.

> [W]aiver is the voluntary, intentional relinquishment of a known right. It results from action or nonaction. The party claiming that there has been a waiver of a contractual provision has the burden of proof on that issue. A waiver may be proved indirectly by facts and circumstances from which intention to waive may be clearly inferred. On summary judgment, the party asserting waiver of a contract term has the affirmative duty to produce evidence demonstrating the existence of an issue of fact concerning the voluntary relinquishment of a known right.

*Sturbridge Home Builders, Inc. v. Downing Seaport, Inc.*, 890 A.2d 58, 65 (R.I. 2005) (citations omitted).

The Court finds that Ms. Haddad has failed in her duty to demonstrate the existence of an issue of fact that Bryant unequivocally waived the overall 3.0 GPA requirement. Because the language that Bryant used in the letters and emails during the early part of 2017 was focused on her progression from the didactic terms to the clinical part of the PA Program through the Remedial Rotation steps, Bryant did not unequivocally relinquish any requirement associated with graduation from the program. Ms. Haddad has presented no disputed issues of fact from which a reasonable jury could infer that Bryant acted with the intent to allow her to graduate without meeting the 3.0 GPA requirement.

Therefore, because the Court finds that the February 1st letter and subsequent communications did not form a new contract between Ms. Haddad and Bryant, her breach of contract claim resting on this argument fails. The Court GRANTS Bryant's Motion for Summary Judgment on Count I.

### B. Fraudulent and Negligent Misrepresentation

Ms. Haddad argues that there are disputes, rooted in the evidence of Bryant's intent, on which a jury could infer that Bryant's letter and email communications

were knowingly false by omitting that it expected her to obtain a 3.0 GPA to graduate. Bryant moves for summary judgment, arguing that there are no disputed material facts underlying Ms. Haddad's misrepresentation claims in Counts II and III because there is no evidence that Bryant said anything false—the overall 3.0 GPA requirement was in the Academic Policies, she was aware of it, and the February 1st letter did not waive that requirement.

To prove her fraudulent and negligent misrepresentation claims, Ms. Haddad must prove: "(1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation." *Mallette v. Children's Friend and Serv.*, 661 A.2d 67, 69 (R.I. 1995); *Manchester v. Pereira*, 926 A.2d 1005, 1012 (R.I. 2007).

Ms. Haddad's misrepresentation claims fail on the evidence submitted. First, there is no evidence that Bryant made a false statement of fact at any time pertinent to this case. As the Court has decided, the Academic Policies unequivocally set forth that Ms. Haddad needed a 3.0 GPA to graduate, she knew of this requirement when she began the PA Program, and there is no evidence that Bryant affirmatively told her that this requirement did not apply to her. Second, Ms. Haddad argues that the February 1st letter omitted the graduation requirement with the intent to induce her

to continue the PA Program while she continued to make her tuition payments, but that letter does not discuss graduation requirements at all. It covers the parameters of the Remedial Rotation that allowed her to progress to the clinical phase—not to graduate—despite having a GPA below 3.0. Moreover, she twice appealed after being dismissed for low academic performance, insisting that she could graduate in accordance with the Academic Policies so her argument that Bryant tried to manipulate her through misrepresentations and/or omissions into staying in the PA Program falls flat. Finally, Ms. Haddad could not have reasonably relied on the February 1st letter as her entire agreement with Bryant to graduate from the PA Program. There is no evidence that Bryant told her that the Academic Policies no longer applied to her or that it intended to waive the overall 3.0 GPA graduation requirement for her alone. She could not have relied on this assurance, because Bryant did not so assure her.

The Court GRANTS Bryant's Motion for Summary Judgment on Counts II and III.

## CONCLUSION

Ms. Haddad gave her best effort to achieve her goal of being a Physician's Assistant but fell short despite Bryant's programmatic accommodations. For these reasons, the Court finds that there are no disputed issues of material fact that would permit a jury to find in her favor on either her breach of contract (Count I) or misrepresentation (Counts II and III) claims. Her punitive damages and injunctive

15

relief claims are also dismissed. Thus, Bryant's Motion for Summary Judgment is GRANTED. ECF No. 16.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

July 15, 2019